**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

UNITED STATES OF AMERICA     *

         *

v.                 *         Criminal No. 15-0004-CG

         *

YAHYA A. ABDELHADI        *

## PLEA AGREEMENT

The abovecaptioned defendant, represented by his counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

## RIGHTS OF THE DEFENDANT

1.     The defendant understands his rights as follows:

      a.     To be represented by an attorney;

      b.     To plead not guilty;

      c.     To have a trial by an impartial jury;

      d.     To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense; and

      e.     To not be compelled to incriminate himself.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

2.     The defendant waives rights b through e, listed above, and pleads guilty to Counts 1, 12 and 19 of the Indictment, charging violations of Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute a mixture and substance containing a controlled substance analogue, Title 21, United States

1

United States Code, Section 846, conspiracy to possess with intent to distribute a Schedule I controlled substance, commonly known as "spice."

3.     The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.     The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5.     The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6.     The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against him. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offense.

7.     The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charge. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

2

8.     A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

9.     This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement. There have been no promises from anyone as to the particular sentence that the Court will impose. The defendant is pleading guilty because he is guilty.

10.     The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter. This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11.     The maximum penalty the Court could impose as to Counts 1 and 19 of the Indictment is:

    a.     Up to 20 years imprisonment;

    b.     A fine not to exceed $1,000,000;

c.    A term of supervised release of 3 years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.    A mandatory special assessment of $100;

e.    Criminal forfeiture of property.

The maximum penalty the Court could impose as to Count 12 of the Indictment is:

f.    Up to 20 years imprisonment;

g.    A fine not to exceed $250,000 or twice the value of the laundered funds;

h.    A term of supervised release of 3 years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

i.    A mandatory special assessment of $100;

j.    Criminal forfeiture of property.

**SENTENCING**

12.    The Court will impose the sentence in this case. The United States Sentencing Guidelines are advisory and do not bind the Court. The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that he will not be allowed to withdraw

4

his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13. The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14. The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15. Both the defendant and the United States are free to allocute fully at the time of sentencing.

16. The defendant agrees to tender $300 to the U.S. District Court Clerk in satisfaction of the mandatory special assessments in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## FORFEITURE

17. The defendant agrees to confess the forfeiture to the United States of all properties which represent proceeds of his criminal activities or which facilitated any aspect of these illegal activities, including real property, personal property,

5

business assets and bank accounts.

## FINANCIAL OBLIGATIONS

18.     The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

19.     The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss all remaining counts once sentence is imposed. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

20.     The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

## APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

21.     The defendant understands and agrees that he has no right to cooperate, and that the decision whether to allow him to cooperate is reserved solely to the United States in the exercise of its discretion. If the United States agrees to allow the

defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

a.    The defendant shall fully, completely, and truthfully respond to all questions put to him by law enforcement authorities regarding the underlying facts of the offense(s) with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

b.    The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether law enforcement authorities question him specifically about any such offense. This provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c.    The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations,

participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.    If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.    The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.    The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.    If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to

the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable. The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h.    The United States and the defendant agree that any breach of this

agreement by the defendant, including but not limited to committing a new

offense, failing to cooperate, intentionally withholding information, giving

false information, committing perjury, failing to identify assets obtained

by him from his illegal activities or obtained by others associated with him

or of which he has knowledge, refusing to take a polygraph examination,

failing a polygraph examination, or refusing to testify before the grand

jury or at any judicial proceeding, would:

(1)    permit the United States to reinstate and proceed with prosecution

on any other charges arising from the matters underlying the

Indictment; and

(2)    permit the United States to initiate and proceed with the

prosecution on any other charges arising from a breach of this

agreement.  The United States will not be limited, in any respect,

in the use it may make against the defendant of any information

provided by the defendant during his breached cooperation.  Such

breach will constitute a waiver of any claim the defendant could

make under the United States Constitution, the Federal Rules of

Evidence, the Federal Rules of Criminal Procedure, or any statute

or case law by which the defendant seeks to suppress the use of

such information or any evidence derived from such information.

i.    Nothing in this agreement shall protect the defendant in any way from

prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his cooperation. The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

j. The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter. His failure to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

22. As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge his guilty plea, conviction, or sentence (including a sentence imposed on revocation of probation or supervised release) in any district court or appellate court proceedings.

a. **EXCEPTIONS.** The defendant reserves the right to timely file a direct appeal challenging:

(1)     any sentence imposed in excess of the statutory maximum;

(2)     any sentence which constitutes an upward departure or variance from the advisory guideline range.

In addition, the defendant further reserves the right to claim ineffective assistance of counsel in a direct appeal or a petition filed pursuant to Title 28, United States Code, Section 2255.

23.     If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

24.     The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

25.     If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

26.     The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant.  In the exercise of its discretion, the United States will be free to

12

prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

27.     In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## **ENTIRETY OF AGREEMENT**

28.     This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: __3/24/15__

Vicki M. Davis, Criminal Chief
Assistant United States Attorney

Date: __3/24/15__

Gloria A. Bedwell
Assistant United States Attorney

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true

13

and accurate in every respect, and that had the matter proceeded to trial, the United States could

have proved the same beyond a reasonable doubt.

Date: 7/23/15 _____    _____
Yahya A. Abdelhadi
Defendant

    I am the attorney for the defendant. I have fully explained his rights to him with respect

to the offense(s) charged in the Indictment in this matter. I have carefully reviewed every part of

this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an

informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein,

with the defendant and to my knowledge, his decision to stipulate to the facts is an informed,

intelligent and voluntary one.

Date: 7/23/15 _____    _____
T. Jefferson Deen, III, Esq.
Defense Counsel

14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA     *

                            *

v.                               *        Criminal No.15-0004-CG

                            *

YAHYA A. ABEDLHADI       *

## FACTUAL RESUME

The abovecaptioned defendant admits the allegations of Counts 1, 12 and 19 of the Indictment.

## ELEMENTS OF THE OFFENSE

**Count 1**:  The defendant understands that in order to prove a violation of Title 21, United States Code, Section 846, as charged in Count 1 of the Indictment, conspiracy to possess with intent to distribute a controlled substance analogue, the United States must prove the following beyond a reasonable doubt:

First, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the possession with intent to distribute a controlled substance analogue; and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan.

**Count 12**:  The defendant understands that in order to prove a violation of Title 18, United States Code, Section 1956(h), conspiracy to launder money, as charged in Count 12 of the Indictment, the United States must prove the following beyond a reasonable doubt:

First, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the transportation, transmission and transfer of a monetary instrument or funds from a place in the United States to or through a place outside the United States with

1

the intent to promote the carrying on of specified unlawful activity (in this case, drug distribution); and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan.

**Count 19**: The defendant understands that in order to prove a violation of Title 21, United States Code, Section 846, as charged in Count 19 of the Indictment, conspiracy to possess with intent to distribute XLR-11, a Schedule I controlled substance, as charged in Count 19 of the Indictment, the United States must prove the following beyond a reasonable doubt:

First, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the possession with intent to distribute controlled substance; and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan.

## OFFENSE CONDUCT

The defendant admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for his plea of guilty. The statement of facts does not contain each and every fact known to the defendant and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

### Facts

During the spring of 2013, the Mobile County Sheriff's Office received information that a synthetic cannabinoids, or "spice," was being distributed at a couple of specific locations in Mobile. Some of the information identified as "Ali" as a person who was selling large quantities "spice" at a specific Citgo Service Station on Airport Boulevard in Mobile. Sheriff's deputies in the narcotics unit made controlled buys of the substance at that location beginning in April of

2

2013. The deputies utilized a confidential informant to make the buys.

The informant subsequently contacted the sheriff's deputies to inform them that a suspect identified as "Zack" was selling "spice" at the American Supermarket on St. Stephens Road in Prichard. The deputies arranged for the first controlled purchase of "spice" from this location using the informant, who actually bought the drugs from a suspect identified as "Mo." In May of 2013, deputies used another confidential informant to make a controlled buy of "spice" from the Citgo station on Airport Boulevard. The informant was equipped with electronic devices to record contact with the dealer in the store. The deputies conducted surveillance at the Citgo station and subsequently obtained positive identifications of several of the people involved in the drug distribution scheme, as well as vehicle descriptions, vehicle registrations and residence addresses.

During May of 2013, deputies made other controlled purchases of "spice" from other members of the conspiracy using confidential informants. These buys were also audio- and video-recorded. Deputies also engaged in surveillance of the locations involved and observed as others in the conspiracy delivered larger amounts of the "spice" to the Citgo store on May 8, 2013. On May 17, 2013, MCSO investigators observed an Arabic male identified as Yahya Abdelhadi driving a black 750 LI BMW displaying Alabama tag 2B81V06 in the parking lot of Citgo station on Airport Boulevard. Abdelhadi was observed removing bags of suspected "spice" into clear gallon sized Ziploc bags. He carried the Ziploc bags and a black plastic garbage bag into the Citgo station. Investigators also observed other Arabic males in two separate vehicles taking possession of what the investigator believed was "spice" concealed in a box and also a second black plastic garbage bag. Abdelhadi entered the BMW and apparently intended to leave the additional "spice" in the trunk. At that time, the investigators stopped the vehicle and secured it,

3

Abdelhadi and the store.

A black male present in the store identified himself (identified herein as Co-conspirator 4) and told the investigators he was a store employee and "lookout." CC4 told investigators that he had worked at the store for three years. He identified four conspirators, including Yahya "Zack" Abdelhadi, who were selling "mojo," or "spice" from the Citgo store and the American Supermarket in Prichard for the past year. CC4 stated that when the "spice" was purchased, the money from the sale would either go into the cash register or the individuals' pants pockets. CC4 stated that the only person he had ever seen take "spice" from the Citgo was "Zack" (Abdelhadi) and that "Zack" also supplied the "spice" to the other stores. CC4 told the investigators that Zack lived off Schillinger Road and that the others lived in an apartment off Hillcrest Road. These locations were identified by the investigators as a residence on Creekwood Place and an apartment at 6700 Wall Street. These subjects, including Yahya Abdelhadi, were arrested on state charges.

On May 17, 2013, state search warrants were obtained for the Citgo store on Airport Boulevard, the apartment at 6700 Wall Street Apartment, the residence at Creekwood Place and two vehicles, the gray Mercedes Benz and the black BMW. The deputies executed the search warrants on the same day. At the Citgo station, the deputies seized a large clear plastic bag with suspected "spice" similar to the one previous removed from the trunk of the BMW by Abdelhadi. Investigators also recovered "spice"-treated plant fragments from the trunk of the BMW and from under the money tray of the cash register of the store. Sgt. Johnny Thornton also recovered a receipt from Alabama Power Company for the center console of the BMW for another business at an address on St. Stephens Road in Eight Mile.

At the residence on Creekwood Place, the deputies seized assorted bills in the name of the American Supermarket on St. Stephens Road in Prichard, paperwork for the Mercedes Benz,

4

assorted Western Union receipts in the name of Irvin Kendrick, paperwork relating to a storage unit at 6430 Grelot Road, inventory sheets for the Grelot Shell station on Schillinger Road and the Airport Shell station on Airport Boulevard, a Toshiba laptop computer, suspected "spice" fragments, two receipts for the Army Aviation Credit Union totaling $33,918.41, handwritten notes reference the price of "spice," receipts from Monterey Spice Company and a shipping label from a large Federal Express box.

The search warrant at the Wall Street apartment resulted in the discovery of suspected "spice" in a bowl in the kitchen, assorted bags for packaging "spice," two additional boxes of plastic bags, a Toshiba computer, a Compra computer, a Dell computer, an Asus computer and an Apple I-Pad.

As a result of the information about the storage unit on Grelot Road, investigators determined that there was a storage unit there rented in the name of Irvin Louis Kendrick, number 111. Investigators had also noticed the Kendrick's name on Western Union receipts recovered during the search. On May 20, 2013, a subpoena was served at the storage business on Grelot Road. The resident manager told the officers that Kendrick came by on Saturday to remove the items from unit 111. The manager thought it was strange because Kendrick did not have a key to the lock and asked that the lock be cut off by maintenance personnel on the property. Investigators spoke to the maintenance personnel, who told them that he had not seen Kendrick at the storage unit on previous occasions, but he had seen an Arabic male driving a black BMW come by there often. The manager told the investigators that on that Saturday, two maroon vehicles came to the storage unit to remove the contents after they had cut off the lock.

On May 20, 2013, Deputies Cassidy and Sullivan located Kendrick at the American Supermarket on St. Stephens Road in Prichard, where he was an employee. That business was

also owned by Abdelhadi. Kendrick was detained when the investigators found that there were three active misdemeanor warrants from the City of Mobile. They transported him to the MCSO narcotics office, where he was advised of his Miranda rights. Kendrick signed a written rights waiver. He stated that he went to the storage unit which he had rented for another co-conspirator (CC2) and Yahya Abdelhadi. They gave him the money to rent the unit, number 111. Kendrick stated that he rented the unit in his name, and did not return to the unit until Saturday May 18. He said "Greg," whose last name he did not know, and a female whose name he did not know, and he all removed boxes of suspected "spice" from the storage unit and transported it in a maroon Ford Expedition to a house on O'Connor Street. Kendrick stated that Abdelhadi had asked him on at least three different occasions to send money that Abdelhadi provided to him, to be wired to China via Western Union. When they arrived on O'Connor Street, Greg LNU removed the "spice" from the maroon Expedition and took it inside the residence there. Kendrick agreed to travel with the investigators to point out the residence on O'Connor Street, which he did.

Sgt. Thornton checked on that address and discovered that a female was listed as the resident there, Laura Winston. Another database check revealed that a maroon Ford Expedition was registered to Winston. Sgt. Thornton also checked the MCSO jail management system and found that Winston had been previously arrested in 2013, and she used the address at 2008 O'Connor Street as her residence address at that time. Deputy Sullivan then prepared a search warrant for that address based upon this turn of events in the investigation, and other investigators traveled to the address to conduct surveillance there. When they arrived, they observed boxes which could have contained the suspected "spice" being loaded into a white Chevrolet Malibu and in the back of a maroon Ford Expedition. Both vehicles left the residence and investigators attempted to stop the vehicles. After a short vehicle pursuit, and a pursuit of one suspect on foot,

the investigators conducted searches of the vehicles and found that both contained contraband.

The Malibu contained 9 white garbage bags containing "spice" packets and additional "spice" packaging material in the front passenger seat. The black male driver of the Malibu, subsequently identified as another of the conspirators, CC3, fled on foot and evaded arrest at that time.

The Expedition contained the boxes in which the "spice" had been initially shipped. There was also additional packaging material in the Expedition. The black male driver who fled from the Expedition was subsequently identified as Tommie Lee Mitchell.

The deputies then executed the state search warrant at the residence on O'Connor Street, where they found Laura Winston, the property owner and resident. She admitted that she was the girlfriend of Mitchell, and while the deputies were there, Mitchell called Winston to ask her if the police were there. She was instructed to tell him "no," which she did. Mitchell told her to leave the house, get a motel room and call him when she had the room. In a subsequent call to Winston, Mitchell told her that he had left $100 in a trash can in front of the American Supermarket. He told Winston not to worry because he would get "that stuff" out of her house.

Deputy Cassidy took Winston to a hotel room where they used money from the Narcotics Fund to rent the room. Winston called Mitchell and told him where she was. Mitchell sent an unidentified subject to the residence on O'Connor Street to break into the house after Winston was gone to get the "spice" out. MCSO deputies were waiting at the house for the subject to break in. He ran out the back door when the deputies announced themselves as law enforcement officers. He successfully evaded arrest.

The O'Connor Street residence was searched pursuant to the search warrant and the deputies recovered 7 white garbage bags containing "spice," a large cardboard box filled with

loose "spice," a large cardboard box filled with "spice" packets, a gallon jug filled with blueberry flavoring, and a spray bottle containing a yellow chemical substance believed to be used to treat the "spice."

The total amount of "spice" seized from both vehicle and the O'Connor Street house was 6,546 packets containing "spice," 3.584 kilograms of loose "spice" not yet packaged, and 51,645 empty packets. The cardboard shipping boxes showed that the "spice" had been shipped to the American Supermarket on St. Stephens Road in Prichard, the Citgo Service Station on Airport Boulevard in Mobile, and another service station on Schillinger Road in Mobile. The HSI lab reports reflect that all the substances contained XLR-11. The total seized from the vehicles and the residence, 930 grams and 1,108.3 grams, totals 2.038 kilograms of XLR-11.

Deputy Sullivan subsequently met with CC3, who provided a statement in which he stated that on May 18, after a few drinks at a block party, he and Tommie Lee Mitchell traveled to Mitchell's baby's mother's house in Prichard. CC3 dropped Mitchell off and went to the liquor store. When CC3 returned from the store, Mitchell and his baby's mother were in the front yard arguing. CC3 said he rode around a while then came back. At that time, he and Mitchell traveled to Winston's house on O'Connor Street and Mitchell was bragging that he was "the man." Mitchell told CC3 that he had $100,000 worth of "spice" and he would show it to CC3. CC3 said that Winston was sitting on the couch in the house and Mitchell said he would show CC3 later. CC3 left, but on May 20, Mitchell called him and told him that CC1 had been arrested and that CC1 had been wiring money. Mitchell told CC3 that he (Mitchell) would pay CC3 $400 to help Mitchell move the "spice" to Prichard. CC3 said that he went to the house on O'Connor Street and loaded up the Chevrolet Malibu with the "Spice." CC3 stated that they left the house and he was supposed to follow Mitchell to the American Supermarket on St. Stephens Road. CC3 stated

8

that when he pulled out, he pulled out in front of the sheriff's deputies. CC3 further stated that on May 21, he received a call from Mitchell in which Mitchell told him that Mitchell had sent someone else to the O'Connor Street house in an attempt to get the "spice."

Laura Winston was also interviewed by the deputies. Winston stated that he had known Mitchell for two weeks and she last spoke to him two hours before he left her residence with the "spice." Winston stated that Mitchell had called her and asked her to meet him at the Handy Storage facility. Winston said when he arrived, Mitchell and an older black male began to load her maroon Ford Expedition. Winston said that Mitchell asked her what she needed for her help and she told him she needed her gas bill paid. After her vehicle was loaded, Mitchell told Winston to take the "spice" to her house. Mitchell and the older black male followed her in another SUV. They unloaded her SUV when they got to her house and Mitchell said he would be back on Monday to get the "spice." Winston stated that prior to the arrival of the deputies at her house, Mitchell had removed the "Spice" from the boxes and put in into the white garbage bags. Winston further stated that she gave Mitchell permission to use her car and Mitchell took the boxes that the "spice" had been in, and put them in her car. Mitchell told her to leave her house and go to a hotel after he had been chased by the police. Mitchell told her he would leave some money for her under the garbage can at the American Supermarket so she could pay for the room. Mitchell also told her to call him when she got out of the house, and he instructed her to leave out the back door and climb over the fence. Winston said Mitchell told her he would break into the house to get the "spice."

Deputy Sullivan obtained a search warrant for the Apple I-pad recovered from 6700 Wall Street, Apartment 3-L on May 17. A review of the data stored in the I-pad showed that Abdelhadi was using it to order "spice," codeine syrup in 5-gallon increments and methylone powder by the

kilogram. There were numerous emails communicating between Abdelhadi and a couple of suppliers in China regarding chemicals and substances involved in the investigation, prices and payment via Western Union. Shipping addresses were also included, reflecting delivery locations at an address on Airport Boulevard and another one on Schillinger Road, two of the businesses identified in the investigation where controlled purchases were made. In addition, emails reflected that Irvin Kendrick was the name in which the money would be sent and his home address was used as one of the delivery locations for the shipments. HSI investigators correlated the emails, the Western Union records and the shipping records to establish evidence of historical shipments and to document the substantive offenses relating to the importation of the various substances identified in the indictment, including XLR-11.

As for the money laundering charges, Abdelhadi sought to conceal his ownership of the money used to pay for the controlled substances, and the transactions obviously promoted the illegal drug distribution activity by giving cash to Kendrick to make the actual transfers. By doing that, Abdelhadi sought to conceal his participation in the transactions. Because the transactions required the money to be sent out of the country for the promotion of the drug trafficking crimes, it is not necessary to identify the money used as drug proceeds. The business records identified above, examined in the context of the emails detailed below, establish evidence of the knowledge required for proof of financial transactions as attempts to launder the drug money under the promotion prong.

HSI Special Agent Sharon Murphy's analysis of the emails, the shipping records and the Western Union records establishes that Abdelhadi received shipments of the chemicals beginning in late 2011. In November of that year, he was ordering bags of "Scooby." He urged the contact in China to keep the "business" between them. He identified his partner as "Ed," and gave the

address for American Supermarket, at 1901 St. Stephens Road, Prichard. The cash for this shipment, $700, was wired through Western Union in the name of Aron Lashore, who provided only the city of Prichard as his address.

In an email using a different email address, Abdelhadi confirmed that he received the package but it was a different chemical, "AM 2201." [1] He complained that it was very weak and he would go back to his old supplier. He said he wanted something better than that, or "JWH 18"[2] or "AM 678." On December 6, the new supplier replied that he had not received other complaints but he would check with his "engineers." On December 24, 2011, Abdelhadi complained again that he had to use double the amount for it to work. On December 29, he inquired how much a kilogram of "AM2201" would cost. On December 30, 2011, he indicated that he was still waiting for a response.

In an email on December 28, 2011, to the initial supplier, Abdelhadi confirms that his employee sent the money, and he provided the confirmation number for $975. An email on December 29 confirmed that the payment arrived in China, and that the delivery would be shipped. On December 30, Abdelhadi inquired whether his supplier in China had ever heard of "Blue Lotus" and "Green Lotus." On January 4, 2012, the supplier provided a tracking number for the shipment. It is not clear from the email exchange which chemicals were shipped in response to these emails. On January 8, 2012, Abdelhadi asked about two new brands, "Kush Super Nova" and "Mojo."

---

1 "AM2201" was an analogue of JWH 18 (see note 2 below). AM2201 was listed as a Schedule I controlled substance as of July 9, 2012, a permanently added as of December 21, 2012.

2 "JWH 18" was scheduled pursuant to DEA's emergency scheduling authority as a controlled substance on March 1, 2011, and permanently scheduled on July 9, 2012. It is also known as AM678. (1Pentyl-3-(1-naphthoyl)indole).

Emails resumed in June of 2012, and Abdelhadi asked for 10-gram "Kush" bags and new "Scooby- pink." On June 21, he is notified that the minimum order of 10,000 bags of each style. Abdelhadi took photographs which he attached to the email because he wanted different writing on the back than what he had. In emails on June 21 and June 22, he communicated this to his supplier.

Emails break and pick up again in September of 2012. On September 2, 2012, he is still discussing 10-gram bags for "Pink Scooby" and 11-gram bags of "Kush." The email exchange between Abdelhadi and the supplier covers information about what they have in stock and the prices for them. On September 20, 2012, the supplier provided Abdelhadi with her personal email address for getting chemicals and she provided him with prices for "5 FUR 144" at $1,050 per kilogram, "AM 2201" at $1,020 per kilogram and "APVP" at $1,300 per kilogram. Abdelhadi replied that he wanted a half-kilogram of each, and if it was "good," he would get a couple of kilograms to start.

On September 21, 2012, they reach an agreement that he would send $1,050 for a half-kilogram of "5 FUR 144" and a half-kilogram of "2201." The email from Abdelhadi confirmed that the money was coming from Irvin Kendrick to the supplier's name in China, and he also provided Kendrick's address in Prichard as the shipment address. Abdelhadi also emailed confirmation that he was getting bags from a different email address in China, and the money, again, was being wired by Kendrick. Kendrick's address in Prichard was also provided as the delivery address for that shipment as well. The supplier confirmed that both the bags and the chemicals would be shipped the following day. On September 26, 2012, Abdelhadi confirmed that he received the chemicals and he wanted another kilogram and a half of each, for a total of 3 kilograms.

12

On October 26, 2012, Abdelhadi emailed the supplier that he wanted a chemical called "Molly," which he described as something like MDMA. The supplier replied that they did not sell MDMA because it was "prohibited." Abdelhadi replied that he wanted something with the "same effect." On November 12, 2012, he provided Western Union information and confirmed the price for 1 kilogram of "5 FUR 144" and one kilogram of "AM 2201," as $2,170. He again identified the sender as Kendrick with a confirmation number. He again provided Kendrick's address for the shipment. On November 14, the supplier sent a tracking number for the chemicals. On November 21, 2012, Abdelhadi confirmed that he received the shipment. He received the invoice for this shipment on December 13, 2012.

On December 13, 2012, Abdelhadi mentioned to his supplier that he had been talking to another supplier, but he still wanted to order from her. They discuss "methylone,"[3] and his supplier told him it was $1,450 for two kilograms. Abdelhadi wanted to know what color it was, and she replied that different colors reflected different purities. She said white was the highest purity. On December 16, 2012, Abdelhadi inquired about methylone as opposed to mephedrone. He decided on December 17 that he wanted a kilogram of methylone and a kilogram of the "same thing as the last order." On December 17, he provided the Western Union information, again coming from Irvin Kendrick to the supplier in China, for $1,450 for the methylone and $1,000 for the chemical from the last time. The shipping address this time was the Shell Gas Station, Zach Abbel, at 3949 Airport Boulevard. The following emails suggested problems with the wires, and money was resent on December 20. On January 9, 2013, Abdelhadi emailed that he received the package. He also inquired that he had heard she had been arrested. The supplier replied that her

---

3 Methylone, (3,4-Methylenedioxy-N-methylcathinone), was added to Schedule I as a controlled substance on October 21, 2011.

boss had been arrested. On January 7, 2013, Abdelhadi ordered a kilogram of methylone, 2 kilograms of "5FUR 144" and 10,000 bags marked "WTF." There was a discussion about the prices for crystals or powder methylone. Although there were no emails after than one that were recovered from the devices seized, there were Western Union records confirming wires sent by Kendrick on January 19, 2013 for $1,800 to the same name and address in China. There were also wires sent by Kendrick to that same name and address on February 26 ($1,830), April 23, ($1,500) April 24 ($1,500) and April 26 ($800). The total amount of money documented in the wires is $14,705.

The parties agree that the defendant is accountable for 7.88 kilograms of XLR-11 and two kilograms of methylone, both Schedule I controlled substances.

AGREED TO AND SIGNED.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: 4/14/15

Vicki M. Davis, Criminal Chief
Assistant United States Attorney

Date: 4/13/15

Gloria A. Bedwell
Assistant United States Attorney

Date: 4/23/15

Yahya A. Abdelhadi
Defendant

Date: 4/23/15

T. Jefferson Deen, III, Esq.
Attorney for Defendant

14